**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:  16-CV-00867-WJM-MEH

PHILIPPA GRACE MCCULLY,

      Plaintiff,

v.

EL PASO COUNTY;
TERRY MAKETA;
PAULA PRESLEY;
MITCHELL LINCOLN;
JOHN MOLATCH;
RON HOWARD;
MICHAEL ST. CHARLES;
LARI HANENBERG;
KIMBERLY FARRELL;
SEAN GRADY;
CHRISTOPHER ROGERS;
SANDRA RINCON;
DEANA FLORES;
MICHAEL KRABLEAN;
ERIK VAUPEL;
KIM MILLER;
CORRECT CARE SOLUTIONS, LLC;
CORRECTIONAL HEALTHCARE COMPANIES, INC.;
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.;
SPENCER OTTLEY;
MICHELLE MACKEY; and
MELANIE HOFFMAN,

      Defendants.

---

**PLAINTIFF'S SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff, Philippa Grace McCully, by and through counsel, Darold W. Killmer and Eudoxie (Dunia) Dickey of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for her Second Amended Complaint and Jury Demand as follows:

## I.    INTRODUCTION

1.    This action arises out of the brutal treatment sustained by and subsequent failure to provide medical care to Plaintiff Philippa Grace McCully at the hands of Defendants Deputy Sean Grady, Deputy Kimberly Farrell, Lieutenant Lari Hanenberg, Deputy Christopher Rogers, Deputy Sandra Rincon, Inmate Class Counselor Deana Flores, Inmate Class Counselor Michael Krablean, Detention Specialist Erik Vaupel, Deputy Kim Miller, Lieutenant Michael St. Charles, Sergeant Ron Howard, Commander John Molatch, Bureau Chief of Detention Mitchell Lincoln, Undersheriff Paula Presley and Sheriff Terry Maketa, who were at all relevant times acting under color of state law in their respective capacities as correctional officers employed at the El Paso County Criminal Justice Center, located at 2739 E. Las Vegas St., Colorado Springs, Colorado 80906 (the "Jail"), and Licensed Practical Nurse (LPN) Spencer Ottley, Mental Health Professional Michelle Mackay and Mental Health Clinician Melanie Hoffman, who were at all relevant times acting in their capacities as medical staff employed by Correctional Healthcare Companies, Inc. and its related entities Correct Care Solutions, LLC and Correctional Healthcare Physicians, P.C.

2.    On or about April 21, 2014, Ms. McCully was arrested and taken to the Jail.  At approximately 11:17 P.M., Deputy Sean Grady, Deputy Kimberly Farrell and Lt. Lari Hanenberg escorted a compliant Ms. McCully into a holding cell. At this point, Defendants Grady, Farrell and Lt. Hanenberg violated Plaintiff's clearly established right to be free of excessive force guaranteed by the Fourteenth Amendment's Due Process Clause when, with the assistance of Lt.

Hanenberg, Defendant Farrell grabbed Plaintiff's feet and brutally pulled Plaintiff's legs out from underneath and behind her, causing Plaintiff to slam forcibly onto the cell floor, audibly hitting her head and knees against the hard concrete surface.  Working in concert, at the same time that Deputy Farrell pulled Plaintiff's legs out from behind her, Deputy Grady excessively forcefully shoved Plaintiff down hard by her left shoulder using his right arm, simultaneously restraining her arms from behind.  Consequently, Plaintiff was unable to break her fall with her arms or hands, and she suffered severe injuries, including but not limited to a fractured left knee, left knee hyperextension with bone contusion, left anterior cruciate ligament (ACL) avulsion tear, torn left posterior cruciate ligament (PCL), left posterior joint capsular tear, extensive, deep bruising on the fronts and backs of her legs and blunt trauma to her face, head and upper body. As Plaintiff lay face-down on the unyielding concrete, having been immediately handcuffed behind her back after her violent takedown and completely incapacitated, Deputy Farrell and Lt. Lari Hanenberg placed their respective knees and full body weight onto the back of each of Plaintiff's legs as Deputy Grady dug his left knee into Plaintiff's back, soon joined by Deputy Christopher Rogers, who excessively forcefully dug his right knee into Plaintiff's back.

3.      The excessive force used against Ms. McCully is a reflection of a long-time custom, practice and policy of the El Paso County Sheriff's Office ("EPSO"), which at the time lacked a constitutionally adequate policy respecting excessive force and for years had failed to adequately train and discipline its employees with respect to the use of excessive force.  The violent and brutal treatment perpetrated upon Philippa McCully represents the standard operating procedure within the El Paso County Sheriff's Office, which has in fact permitted a culture of excessive force to fester in its Jail, and condoned and ratified the actions of staff who engaged in excessive force against inmates.

4.     Following this dramatic take-down, Ms. McCully immediately screamed out in pain that her left leg was broken and she was in acute pain from her multiple injuries.  Although she voiced her concern that her leg was broken over and over again, had obvious and visible difficulty standing up and walking and repeatedly requested medical attention the night of April 21st-22nd, 2014, and throughout the rest of her five (5) day detainment at the Jail, her clearly established Fourteenth Amendment Due Process right to receive medical treatment was callously ignored and violated by Defendants' deliberate indifference to Plaintiff's serious medical condition and their failure to provide constitutionally adequate medical evaluation or treatment, despite Defendants' awareness of Plaintiff's serious and obvious injuries.  As a result, Plaintiff spent her five days in custody at the Jail in excruciating pain and nearly unable to walk.  Moreover, Plaintiff's injuries worsened significantly for lack of early medical evaluation, attention and intervention.

5.     Each of the El Paso County Sheriff's Office and Correctional Healthcare Companies, Inc. and its related entities have a respective custom, policy and practice of failing to evaluate and treat the serious medical conditions of inmates at the Jail, and each condone and fail to discipline correctional officers and medical staff for failing to appropriately provide medical attention.

6.     As a result of the Individual Defendants' actions and inactions, and El Paso County's custom, policy and practice with respect to excessive force, and El Paso County's and Correctional Healthcare Companies, Inc.'s and its related entities' respective customs, policies and practices with respect to provision of medical care, Plaintiff suffered severe physical and emotional damages and continues to be traumatized by her brutal and painful ordeal.

## II.     JURISDICTION AND VENUE

4

7.      This action arises under the Constitution and laws of the United States and the State of Colorado, and is brought pursuant to Title 42 U.S.C. § 1983.

8.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

9.      Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

10.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

### III.     PARTIES

**Plaintiff**

11.     Plaintiff, Philippa Grace McCully, is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in the State of Colorado.

**Defendants**

12.     Defendant El Paso County is a governmental entity chartered under the laws of the State of Colorado.  Among other things, El Paso County operates the El Paso County Criminal Justice Center ("the Jail"), located at 2739 E. Las Vegas St., Colorado Springs, Colorado 80906.

13.     At all times relevant to this Complaint, Defendant Sheriff Terry Maketa was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in his capacity as Sheriff of the El Paso County Sheriff's Office.

14.     At all times relevant to this Complaint, Defendant Undersheriff Paula Presley was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in her capacity as Undersheriff of the El Paso County Sheriff's Office.

15.     At all times relevant to this Complaint, Defendant Bureau Chief of Detention Mitchell Lincoln was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in his capacity as the Bureau Chief of Detention the El Paso County Sheriff's Office.

16.     At all times relevant to this Complaint, Defendant Commander John Molatch was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in his capacity as a correctional officer employed by the El Paso County Sheriff's Office.

17.     At all times relevant to this Complaint, Defendant Sergeant Ron Howard was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in his capacity as a correctional officer employed by the El Paso County Sheriff's Office.

18.     At all times relevant to this Complaint, Defendant Lieutenant Michael St. Charles was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in his capacity as a correctional officer employed by the El Paso County Sheriff's Office.

19.     At all times relevant to this Complaint, Defendant Lieutenant Lari Hanenberg was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in her capacity as a correctional officer employed by the El Paso County Sheriff's Office.

20.     At all times relevant to this Complaint, Defendant Deputy Kimberly Farrell was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting

under color of state law in her capacity as a correctional officer employed by the El Paso County Sheriff's Office.

21.     At all times relevant to this Complaint, Defendant Deputy Sean Grady was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in his capacity as a correctional officer employed by the El Paso County Sheriff's Office.

22.     At all times relevant to this Complaint, Defendant Deputy Christopher Rogers was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in his or her capacity as a correctional officer employed by the El Paso County Sheriff's Office.

23.     At all times relevant to this Complaint, Defendant Deputy Sandra Rincon, a female, was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in her capacity as a correctional officer employed by the El Paso County Sheriff's Office.

24.     At all times relevant to this Complaint, Defendant Inmate Class Counselor Deana Flores was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in her capacity as a correctional officer employed by the El Paso County Sheriff's Office.

25.     At all times relevant to this Complaint, Defendant Inmate Class Counselor Michael Krablean was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in his capacity as a correctional officer employed by the El Paso County Sheriff's Office.

26.     At all times relevant to this Complaint, Defendant Detention Specialist Erik

Vaupel was a citizen of the United States, resident of and domiciled in the State of Colorado and

was acting under color of state law in his capacity as a correctional officer employed by the El

Paso County Sheriff's Office.

27.     At all times relevant to this Complaint, Defendant Deputy Kim Miller was a

citizen of the United States, resident of and domiciled in the State of Colorado and was acting

under color of state law in her capacity as a correctional officer employed by the El Paso County

Sheriff's Office.

28.     Defendant Correct Care Solutions, LLC ("CCS") is a corporate medical care

provider and a for-profit Tennessee corporation organized in Kansas and doing business in the

State of Colorado, with its principal street address located at 1283 Murfreesboro Road, Suite

500, Nashville, TN 37217.  Its registered agent of service in Colorado is located at 3773 Cherry

Creek North Drive #575, Denver, CO 80209.  CCS is the corporate parent company of

Defendant Correctional Healthcare Companies, Inc. described in ¶ [29] below.

29.     Defendant Correctional Healthcare Companies, Inc. ("CHC") is a for-profit

Colorado corporation registered in Delaware, with its principal place of business at the street

address located at 6200 S. Syracuse Way, Suite 400, Greenwood, Village, Colorado, 80111.

CHC is a direct or indirect wholly-owned subsidiary of CCS.  At all times relevant to this

Complaint, CHC contracted with El Paso County to provide medical services to inmates and

detainees at the El Paso County Criminal Justice Center and supervised and implemented such

care.  At all times relevant to this Complaint, CHC was the direct employer of the Medical Staff

Defendants listed in ¶ 33, ¶ 34 and ¶ 35 below.

30.     Defendant Correct Care Solutions, LLC, Correctional Healthcare Companies, Inc. and their related entity Correctional Care Physicians, P.C. are related corporate entities, and are collectively referred to as the "CCS Defendants."

31.     CCS Defendants are proper entities to be sued under 42 U.S.C. § 1983 for their deliberately indifferent policies, practices, habits, customs, procedures, training, and supervision of staff, including individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs.

32.     At all relevant times, the CCS Defendants were acting under color of state law and performing a central function of the state thus making them liable under § 1983.  All the conduct of the CCS Defendants and its employees and agents is also chargeable to the government, and CCS Defendants were acting jointly with the government actors.

33.     At all times relevant to this Complaint, Defendant Licensed Practical Nurse (LPN) Spencer Ottley was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in his capacity as a nurse employed by the CCS Defendants.

34.     At all times relevant to this Complaint, Defendant Mental Health Professional Michelle Mackey was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in her capacity as a mental health clinician employed by the CCS Defendants.

35.     At all times relevant to this Complaint, Defendant Mental Health Clinician Melanie Hoffman was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in her capacity as a mental health clinician employed by the CCS Defendants.

36.     Defendants Maketa, Presley, Lincoln, Molatch, Howard, St. Charles, Hanenberg, Farrell, Grady, Rogers, Rincon, Flores, Krablean, Vaupel, Miller, Ottley, Mackey and Hoffman are referred to collectively as the "Individual Defendants."

37.     Defendants Maketa, Presley, Lincoln, Molatch, Howard, St. Charles, Hanenberg, Farrell, Grady, Rogers, Rincon, Flores, Krablean, Vaupel and Miller are referred to collectively as the "Jail Staff Defendants."

38.     Defendants Ottley, Mackey and Hoffman are referred to collectively as the "Medical Staff Defendants."

## IV.     FACTUAL ALLEGATIONS

### A.  PHILIPPA MCCULLY'S LIFE

39.     Ms. McCully was born on January 5, 1993.



40.

The above image is a photograph of Ms. McCully with her cousin, Leah, 2, pictured on Easter of 2016.

41.    Ms. McCully is a petite young woman, approximately 5 feet, 0 inches tall and weighing just 100 pounds.

42.     Ms. McCully was 21 years old at the time of this incident.

43.     Ms. McCully, known as Pippa, has a very close and loving relationship with her identical twin sister Caroline McCully, known as Zara, both of whom were in their junior year at Colorado College in Colorado Springs, Colorado at the time of Ms. McCully's arrest.



44.

The above image is a photograph of Ms. McCully, known as "Pippa", right, with her twin sister Caroline, known as "Zara," left, pictured in December 2013.

45.     During her sophomore year, Ms. McCully was diagnosed with cancer and Ollier Disease, a rare skeletal disorder which causes tumors, one of which had metastasized to chondrosarcoma and was discovered on Ms. McCully's left ischium, or butt bone.

46.     Following this devastating diagnosis, on March 1, 2013, Ms. McCully underwent life-saving surgery to remove the tumor and three quarters of her left ischium, or butt bone,

making sitting difficult and uncomfortable and requiring Ms. McCully to sit down carefully and place more weight on her right side.

47.     Ms. McCully continued with her regular studies and activities as a college student, but she was anxious about her diagnosis and prognosis and became depressed.  During her sophomore and junior years at Colorado College, Ms. McCully was treated by clinical staff at the Colorado College Student Health Center, who prescribed various psychiatric medications in an effort to alleviate her depression and anxiety.

48.     By the spring of 2014, the combination of medications began causing Ms. McCully to act erratically, and it was in this context that she was arrested for the very first time in her life on the night of April 21, 2014.

49.     On the evening of April 21, 2014, Ms. McCully was arrested for menacing, criminal attempt and reckless driving after she drove a car and nearly struck other persons with the vehicle.

50.     That evening, several students alerted Roy Garcia, security officer at Colorado College to McCully's reckless driving on campus, and Mr. Garcia contacted Officer Newton of the EPSO.  Officers Powers and Caro of the EPSO were also dispatched to the scene.  After Officer Newton conducted a Mirandized interview with Ms. McCully inside of her apartment, he arrested her and transported her to the Jail.

**B.  PHILIPPA MCCULLY'S DETAINMENT AT THE EL PASO COUNTY CRIMINAL JUSTICE CENTER**

51.     Following her arrest on April 21, 2014, Ms. McCully was brought to the Jail, where she was booked and provided with a jail uniform.

52.      At approximately 11:17 P.M. on April 21, 2014, Defendant Deputy Grady marched the orderly and compliant Plaintiff into a holding cell, gripping under her arms from behind in a "Double Under Hook" hold.  Ms. McCully was cooperative and non-resistant.

53.      Defendant Deputy Farrell and Lieutenant Lari Hanenberg quickly followed and the three officers surrounded the unresisting Plaintiff, who was calmly standing facing the cell wall.

54.      Suddenly, without any provocation or warning and without Ms. McCully knowing it was going to happen, and with help from Lieutenant Hanenberg, Deputy Farrell forcefully pulled her legs out from under her from behind, and with his right arm Deputy Grady excessively forcefully shoved Plaintiff down hard by her left shoulder onto her front side and face, simultaneously restraining her arms from behind.

55.      The image below is a still screenshot taken at approximately 11:17:32 P.M. on April 21, 2014, from Jail video footage taken of Philippa McCully's holding cell, cell 3, from approximately 11:17 P.M. on April 21, 2014 through approximately 3:44 A.M. on April 22, 2014 (the "Jail Surveillance Video").  This image depicts the moment when with help from Defendant Hanenberg, Defendant Farrell excessively forcefully pulled Plaintiff's legs out from under her, while Defendant Grady excessively forcefully shoved Plaintiff down hard onto the floor. Defendant Rogers can be seen looking on.



56.     Because Defendant Grady had restrained her arms from behind, Plaintiff was unable to break her fall with her hands or arms, breaking it instead with her knees.  She suffered severe injuries, as detailed below.

57.     As Plaintiff lay face-down on the unyielding concrete, now handcuffed behind her back and completely incapacitated, Deputy Farrell and Lt. Lari Hanenberg placed their respective knees and full body weight onto the back of Plaintiff's legs, as Deputy Grady dug his left knee into Plaintiff's back, soon joined by Deputy Rogers, who dug his right knee into Plaintiff's back with excessive force.

58.     The image below is a photograph taken by Defendant Detention Specialist Erik Vaupel shortly after the violent takedown of Ms. McCully.



The picture depicts an image of Plaintiff's face, her head having just hit the unforgiving concrete cell floor with a loud thud, while she is being handcuffed and unnecessarily forcefully restrained by the four large Defendants amassed on top of her 100 pound frame.

59.     As a result of this violent takedown, Plaintiff suffered severe injuries, including but not limited to a fractured left knee, left knee hyperextension with bone contusion, left anterior cruciate ligament (ACL) avulsion tear, torn left posterior cruciate ligament (PCL), left posterior joint capsular tear, extensive, deep bruising on the fronts and backs of her legs and blunt trauma to her face, head and upper body.

60.     Immediately realizing her left leg was broken following her rough and unjustified takedown, Plaintiff yelled without hesitation "You broke my leg!  You broke my leg!" to the four Defendant officers amassed on top of her.

61.     When Deputy Farrell asked Plaintiff to which leg she was referring, Plaintiff indicated her left leg was hurt.

62.     From that moment on and continuing through the remainder of her 5-day stay in the Jail, Plaintiff never ceased verbally alerting any and all Defendant officers and medical staff to her pain and the severity of her broken left knee and requested medical attention over and over again.  During this entire time, Ms. McCully never once met with a medical professional nor received any kind of medical examination, evaluation or treatment.  She did not receive as much as an aspirin.

63.     In response to Plaintiff's urgent plea, Deputy Ferrell called in Defendant LPN Ottley to evaluate Plaintiff's injuries.

64.     Without even turning Plaintiff onto her back and to conduct a proper examination of her legs and knees, at approximately 11:18 P.M. LPN Ottley proceeded to indifferently conduct a wholly cursory and inadequate check of her legs and feet, hastily clearing her of any injuries within less than one second.

65.     Between approximately 11:19 P.M. and 11:20 P.M., LPN Ottley returned to conduct another equally inadequate and perfunctory check of Plaintiff's legs and feet, again quickly clearing her of any injuries, despite the obvious presence of injuries and pain.

66.     Because Plaintiff was lying on her front at the time, LPN Ottley did not observe her legs or feet during either search.  He did not even attempt to do so.

67.     Instead of heeding Plaintiff's exigent insistence that her leg was broken and providing her with the prompt medical attention her injuries warranted, at approximately 11:20 P.M., Defendants Grady, Farrell, Hanenberg, Ottley, Rogers and Vaupel left Plaintiff alone lying face down on the hard cell floor, still handcuffed from behind.

68.     From approximately 11:20 P.M. on April 21, 2014 until approximately 12:32 A.M. on April 22, 2014, Plaintiff was left alone in extreme pain, visibly in distress and attempting to crawl around the holding cell.

69.     Plaintiff's struggles to move about her cell and inability to stand up or bend her leg were visible to Defendant officers in real-time via the live video feed of the Jail security camera and upon visual inspection of her cell if anyone bothered to look into the cell window.

70.     In her incident report, Defendant Farrell noted she observed Plaintiff's near inability to stand up or bend her left leg, and heard her cries of "Help me!"

71.     But instead of assisting Plaintiff by calling a doctor or other medical professional, Defendant Farrell deliberately and indifferently dismissed Plaintiff's distress by stating that she had already been checked and cleared of injury by Defendant LPN Ottley.

72.     With no option but to lie or sit on the hard, concrete floor, Plaintiff experienced additional pain because of her prior cancer surgery in which three quarters of her left ischium, or butt bone, had been removed, making sitting highly uncomfortable, let alone on rocklike concrete.

73.     When Plaintiff removed her pants in order to inspect her injuries at approximately 12:09 A.M. on April 22, 2014, her fractured left knee appeared visibly swollen.

74.     At approximately 12:29 A.M., Plaintiff again struggled to stand up, but ultimately failed because of her inability to bend or place any weight onto her left leg.  Still handcuffed behind her back, Plaintiff was unable to use her hands to brace herself against the cell wall.

75.     Defendants Farrell, Hanenberg and Rincon entered her cell at approximately 12:32 A.M., over 70 minutes after abandoning Plaintiff, and found her handcuffed and writhing in pain from a knee whose fracture the officers themselves had caused.

76.     Plaintiff again insisted to Defendants Farrell, Hanenberg and Rincon that her leg was broken.

77.     Yet again LPN Ottley was called in to perform another totally deficient medical examination of Plaintiff's knees, legs and feet, following which he deliberately and indifferently pronounced that while she may have overextended her knee, Plaintiff's leg was definitively not broken, according to his medical judgment.

78.     Consistent with the extent and seriousness of her pain and injuries, Plaintiff asked whether she would be taken to a hospital.

79.     LPN Ottley denied Plaintiff's request, with deliberate indifference to her serious and obvious medical condition, and refused to provide any additional medical evaluation, treatment, call a medical professional or to transport Plaintiff to a hospital or other medical facility as she requested.

80.     LPN Ottley told Plaintiff he would be able to get her some pain medication later.

81.     This promised medication never arrived, and Plaintiff did not receive any pain medication during her entire stay in custody.

82.     At this point, Defendants Farrell, Hanenberg and Rincon and LPN Ottley, as well as their respective supervisors, were on notice and were or should have been clearly aware of the

extent of Plaintiff's serious and obvious severe pain and injuries, evidenced by her swollen knees, her inability to bend her left leg, her struggles to stand up or walk, her cries for medical assistance and the deep purple bruising already covering the entirety of her feet, lower legs and knees.

83.     Nevertheless, at approximately 12:41 A.M., Defendants Farrell, Hanenberg and Rincon and LPN Ottley left Plaintiff in her cell once again, alone and in obvious pain and distress.

84.     Plaintiff repeatedly requested medical attention by insistently pressing the call button in her cell and banging on the cell window with her hands at approximately 1:18 A.M., 1:19 A.M., 2:01 A.M., and 2:27 A.M. without any response.

85.     During this period of time, various officers can be observed walking outside her cell window, callously ignoring Plaintiff's pleas for assistance with deliberate indifference.

86.     At approximately 1:19 A.M., Plaintiff pushed herself up with great effort, bracing with her right arm against the wall, and hobbled over to the window to ask for help.

87.     At approximately 1:19 A.M., Plaintiff spoke with Defendant Farrell through the cell window, begging for help, and shortly thereafter Defendant Farrell inaccurately noted in a report, "I observed inmate McCully standing on both legs, her right hand on her hip, without any issues."

88.     At approximately 1:30 A.M., Plaintiff once again explained that she had a broken leg to Defendant Deputy Rincon through the cell window, but neither Deputy Rincon, Deputy Farrell, their supervisors nor any other Defendants took any actions to assist Plaintiff or provide her with appropriate medical care.

20

89.     Finally, at approximately 3:19 A.M., Defendants Hanenberg, Miller, Rincon and Farrell entered Plaintiff's cell and proceeded to take multiple digital photographs of each of Plaintiff's legs and arms, once again being placed on notice of Plaintiff's extensive, serious and obvious injuries.  Large purple bruising on Plaintiff's legs and knees is clearly visible in both the Jail Surveillance Video as well as in the digital photographs taken between approximately 3:20 A.M. and 3:21 A.M.

90.     The image below is a photograph taken by Deputy Farrell between approximately 3:20 A.M. and 3:21 A.M. on April 22, 2014.  The picture depicts Plaintiff McCully's broken left knee and extensive, deep purple bruising on the fronts of both legs which is consistent with where her legs slammed into the concrete cell floor at approximately 11:17pm on April 21, 2014. When compared with her right knee, the dramatic swelling in her left knee is readily apparent.



91.     The image below is a photograph taken by Deputy Farrell, between approximately 3:20 A.M. and 3:21 A.M. on April 22, 2014.  The picture depicts Plaintiff McCully's broken swollen left knee and left leg, covered with extensive, deep purple bruising which is consistent with where the front of both of her legs slammed into the concrete cell floor at approximately 11:17pm on April 21, 2014.  The dramatic swelling in her left knee is readily apparent.



92.     The image below is a photograph taken by Deputy Farrell, between approximately 3:20 A.M. and 3:21 A.M. on April 22, 2014.  The picture depicts Plaintiff McCully's right knee and leg marked by extensive, deep purple bruising which is consistent with where the fronts of both of her legs slammed into the concrete cell floor at approximately 11:17pm on April 21, 2014.



93.     Plaintiff bruises extremely easily and quickly, so although she may have arrived

at the Jail with a few discrete, minor pre-existing bruises on her arms, the extensive deep purple

bruising captured in the digital photographs taken at this time are the result of and consistent

with the excessive force perpetrated upon Plaintiff by Defendants Grady, Farrell, Hanenberg and

Rogers a full four (4) hours earlier, between approximately 11:17 P.M. and 11:20 P.M. the night

of April 21, 2014.

94.     At approximately 3:22 A.M., Defendant Hanenberg instructed Plaintiff to get up,

and Plaintiff struggled to stand up with utmost difficulty, forced to brace herself with her left arm

against the cell wall and unable to place any weight at all on her broken left leg.

95.     At approximately 3:22 A.M., Defendants Hanenberg, Miller, Rincon and Farrell observed Plaintiff's supreme difficulty standing up and walking, yet they took no actions to provide the urgent medical care she desperately needed.

96.     Between approximately 3:23 A.M. and 3:24 A.M., as Defendant Hanenberg was speaking with Plaintiff, out of necessity Plaintiff braced herself with her right arm against the cell wall in order to remain standing.  Otherwise, she would have collapsed.

97.     As Plaintiff limped over to the door of her cell at approximately 3:24 A.M., she was clearly unable to walk without the support of her right hand against the cell wall.

98.     At approximately 3:24 A.M., unable to walk any further without support, Plaintiff collapsed, falling forward onto the ground, at which point she lay back and extended her broken left leg, unable to bend it.

99.     At this point, Plaintiff was completely unable to stand without assistance due to her worsening pain and injury.

100.    In order to stand at all, Plaintiff required the assistance of Defendant Deputy Miller, who helped push Plaintiff up and supported her as she walked back into the cell, then helped her sit down on the floor.

101.    At approximately 3:25 A.M., undoubtedly recognizing Plaintiff's complete inability to stand up on her own, Defendant Hanenberg extended her arm to pull Plaintiff up so that she would be able to leave the cell.

102.    Despite all the mounting evidence suggesting that Plaintiff's left knee was broken and she was in excruciating pain and real physical and mental distress, at approximately 3:35 A.M., Defendant Grady excessively roughly pulled Plaintiff back into the cell, grabbing her right arm from behind, as Defendant Rincon pulled Plaintiff from behind by her left arm.

24

103.   The image below is a Jail Surveillance Video screenshot, taken at approximately 3:35:43 A.M. on April 22, 2014, which depicts the moment that Defendants Grady and Rincon excessively forcefully gripped Plaintiff's arms from behind and pushed her back into the holding cell, forcing her to walk upon her broken left leg.  Defendant Farrell can be seen following Plaintiff and Defendants Grady and Rincon into the cell.



104.   Plaintiff can be seen screaming in pain.  Obviously, Defendants Grady, Rincon and Farrell observed these clear indications of pain, suffering and severe injury.

105.   At approximately 3:36 A.M., Defendant Grady roughly and callously pushed down on Plaintiff's left shoulder as she sat down on the concrete floor, which was extremely painful for her in light of her prior surgery removing three quarters of her ischium, or butt bone.

106.    Defendants again left Plaintiff alone in her cell, without requesting any medical attention for her or even taking the minimal step of asking LPN Ottley to again examine her, in light of her progressively worsening serious medical condition.

107.    Between approximately 3:36 A.M. and the officers' return at 3:34 A.M., Plaintiff intermittently holds her left knee with her right arm, in obvious pain.

108.    At this time, Plaintiff's right leg pant appears in the Jail Surveillance Video to be covered in blood.

109.    Following Plaintiff's release from her holding cell at approximately 3:44 A.M., Defendant LPN Ottley examined Plaintiff and, finally recognizing the gravity of her injuries, at approximately 3:54 A.M. issued a "Lower Bunk" alert, indicating that during the entirety of her remaining stay in Jail and due to her injuries, Plaintiff would be assigned a bottom bunk.

110.    An itinerary of "Scheduled Events for Inmate" indicates that as of April 22, 2014, Plaintiff "**NEEDS LOWER BUNK ONLY**." (emphasis added)

111.    Plaintiff was indeed assigned a lower bunk during the entirety of her remaining custody at the Jail.

112.    At this point, Defendant LPN Ottley knew or should have known that Plaintiff was incapable of climbing up a ladder to a top bunk, and yet inexplicably he took no action to contact other medical personnel or transport Plaintiff to an Emergency Room or other medical facility.

113.    At approximately 7:50 P.M. on April 22, 2014, Defendant Inmate Class Counselor Michael Krablean administered a "Point Based Classification Report" to Plaintiff, in which he noted that in response to question 26, "Are you physically handicapped/ restricted mobility?" Plaintiff indicated "Yes" and Defendant Krablean noted in the report "LEG

PROBLEMS.  **MEDICAL KNOWS**.  INMATE WAS GIVEN A MEDICAL KITE TO RE-ALERT THEM." (emphasis added).

114.    Plaintiff then used this medical kite on April 22, 2014, to re-alert medical staff of her urgent need for assistance.

115.    Despite medical staff's awareness and recognition of Plaintiff's "leg problems," no response to Plaintiff's urgent medical kite came on April 22, 2014 or April 23, 2014.

116.    It was not until approximately 7 A.M. on April 24, 2014—approximately *eighty (80) hours* from the time she sustained her injuries at the hands of four of the Defendants—that someone was sent to escort Plaintiff to meet with a medical professional.

117.    Plaintiff spent these eighty (80) hours in excruciating and unnecessary pain.

118.    The previous day, Plaintiff's attorney informed Plaintiff that she would imminently be released by 12 P.M. on April 24, 2014.  Therefore, Plaintiff declined medical assistance, but only because she was planning to be admitted to a hospital immediately upon what she believed to be her imminent release.

119.    When she realized she would not in fact be released on April 24, 2014 as her attorney had indicated, Plaintiff again sent a medical kite that same day, but no one ever came to check on Plaintiff's medical condition prior to her release from the Jail on April 25, 2014 at approximately 6:18 P.M., over 24 hours later.

120.    After meeting with Plaintiff on the evening of April 24, 2014, her attorney told Jail staff that medical staff needed to evaluate and treat Plaintiff's leg immediately, but once again, no one took any action to attend to Plaintiff's deteriorating medical condition and continued severe pain and suffering.

121.     Plaintiff never met with a medical professional – with the exception of Defendant LPN Ottley – during her entire time in custody.  At all times Defendant LPN Ottley demonstrated deliberate indifference to Plaintiff's known and serious medical needs.

122.     At approximately 7:50 P.M. on April 22, 2014, Mental Health Professional Michelle Mackey noted on Plaintiff's Inmate Classification Report that her classification was "Minimum.  Placed on Suicide Preventions."  Later, at 4:41 P.M. on April 24, 2014, Defendant Mackey placed Plaintiff on a "MH Alert" because of her deteriorating mental state, caused in part by her extreme pain, injuries and physical distress.  Having had an opportunity to observe or examine Plaintiff carefully enough to make a note regarding her proper inmate classification and declare a mental health alert, Defendant Mackey knew or should have known of Plaintiff's mental and physical distress – distress so severe as to potentially rise to the level of requiring suicide prevention.  Yet, Defendant Mackey did nothing to address Plaintiff's obvious and severe physical pain and injuries.

123.     At the same time, Defendant Mental Health Clinician Melanie Hoffman noted on Plaintiff's Inmate Classification Report that her classification was "Minimum.  RS REMOVED START YS."  Having had a chance to observe or examine Plaintiff carefully enough to make a note regarding her proper inmate classification, Defendant Hoffman knew or should have known of Plaintiff's severe and obvious mental and physical distress.  Yet, like Defendant Mackey, Defendant Hoffman took no actions to address Plaintiff's obvious and severe pain and injuries.

124.     Defendants Sheriff Terry Maketa, Undersheriff Paula Presley, Bureau Chief of Detention Mitchell Lincoln, Commander John Molatch, Sergeant Ron Howard, Lieutenant Michael St. Charles, Lieutenant Lari Hanenberg and, upon information and belief Inmate Class Counselor Deana Flores, were the supervisors on duty on the night of April 21-22, 2014, who

knew or should have known of the treatment and condition of Plaintiff McCully at the jail, and as such are legally responsible for the respective actions and inactions of the other Jail Staff Defendants.  Defendant Sheriff Maketa was the final policy maker for the El Paso County Jail, responsible for the development and implementation of policies, training, supervision, discipline and retention of subordinate jail personnel.  All supervisory defendants named herein condoned and ratified the constitutional violations detailed herein.

125.   Throughout Plaintiff's 5-day stay at the Jail, the Individual Defendants' deplorable lack of reaction were constitutionally insufficient and simply not commensurate with the gravity of Plaintiff's obvious and serious injuries.

126.   The Individual Defendants fully recognized the gravity of Plaintiff's medical condition, but with deliberate indifference they took no adequate actions to alleviate her serious and obvious pain and injuries.

127.   During the entirety of her detainment at the Jail, Plaintiff did not receive as much as an aspirin.

128.   As a result of this gross violation of her clearly established Constitutional right to receive medical treatment, Plaintiff suffered extreme pain and a preventable worsening of her injuries during her five (5) day ordeal at the Jail.



129.

The image above is a photograph taken by Ms. McCully shortly after her release from

Jail on April 25, 2014 which depicts whole-scale, deep purple bruising extending across the back

of Ms. McCully's left foot, leg and thigh.  According to Dr. Gautam Yagnik, MD, an orthopedic

surgeon in Miami, Florida and Ms. McCully's treating physician in connection with her broken

knee and other injuries described herein, this bruising resulted from a posterior joint capsule

disruption with marked posterior knee edema and hemorrhage that occurred during her violent

takedown by Defendants Grady, Farrell and Hanenberg at approximately 11:17 P.M. on April 21, 2014.

130. To treat her fractured left knee, left knee hyperextension with bone contusion, left anterior cruciate ligament (ACL) avulsion tear, torn left posterior cruciate ligament (PCL), and left posterior joint capsular tear, among other injuries, after her release from the Jail, Ms. McCully was required to wear a full leg cast, extending from her thigh to her ankle, for 7 days. She then had to wear a custom knee brace for a month.  Once the brace was removed, Ms. McCully needed to undergo physical therapy twice per week for 4 months.

131. As much as 7 months later, Ms. McCully was still experiencing pain and a crackling or popping sensation in her left knee.

132. Although her torn ACL eventually healed, Ms. McCully sustained permanent injuries to her PCL, which doctors have advised will always remain loose.

133. Her injuries were so severe that Dr. Yagnik, Ms. McCully's physician, told her he had seen the same injuries just once before in his entire career – *on a Miami Dolphins linebacker*.

134. Too traumatized by this experience to remain in Colorado Springs, Colorado, Ms. McCully left Colorado for good shortly following her arrest and detainment at the Jail.

### C.  EL PASO COUNTY'S CUSTOM, PATTERN AND PRACTICE OF EXCESSIVE FORCE

135. El Paso County and the El Paso County Sheriff's Office have created, fostered, maintained and tolerated an environment and culture of law enforcement brutality and deliberate indifference to the constitutional rights of its citizens and residents.

136. El Paso County law enforcement officers have repeatedly and unlawfully used excessive force against citizens.

137.   El Paso County law enforcement officers have engaged in a persistent practice of law enforcement misconduct, and the officials responsible for assuring that such misconduct does not occur have consistently failed to properly train, supervise, and discipline individual officers who have engaged in such misconduct.

138.   An Organizational Assessment of the El Paso County Sheriff's Office prepared by KRW Associates, LLC on June 17, 2015[1] (the "Organizational Assessment") found that between 2010 and 2014, incidents of use of force against inmates by El Paso County Sheriff's Office correctional officers saw a dramatic rise:

| YEAR | # USE OF FORCE REPORTS |
|------|------------------------|
| **2014** | **458** |
| 2013 | 322 |
| 2012 | 272 |
| 2011 | 261 |
| 2010 | 130 |

139.   The Use of Force Policy of the El Paso County Sheriff's Office in effect in 2014 was inadequate and constitutionally deficient.  The Organizational Assessment notes that this Use of Force Policy "is not clearly written and does not conform to best practices" and strongly advised making 18 key changes to the policy, which were lacking in the policy in effect in 2014.  Such changes include but are not limited to the following:  "1. A statement recognizing the sanctity of life and the significance of using deadly force;" "2. Statement of policy acknowledging that only force which is 'objectively reasonable' shall be used;" "4. Use of

---

[1] Organizational Assessment of the El Paso County Sheriff's Office, by KRW Associates, June 17, 2015 (see: http://posting.csindy.com/media/pdf/krw_report.pdf) ("Organizational Assessment"), at p.17.

advisements, warnings and verbal persuasion, when possible, before resorting to force;" "5.  Use

of de-escalation techniques to attempt to lessen the likelihood of the need to use force or to

reduce the level of force;" "6.  Use of tactical options to attempt to reduce the need for force or

the level of force…;" " 7. Duty to deescalate immediately as resistance decreases and the threat

subsides;" "10. Duty to <u>immediately</u> notify a supervisor after witnessing or becoming aware of

the use of unnecessary or excessive force by another deputy;" (emphasis in original) "11.  Duty

to intercede, when possible, to stop the use of unnecessary and excessive force by another

deputy;" "13. Factors to consider in determining the reasonableness of force options;" "15.  Duty

of supervisors to investigate and evaluate use of force by subordinates;" "16. Duty to provide

medical assistance to persons against whom force was used;" "17. Acknowledgement of

constitutional requirements for the use of force in an institutional/ correctional setting (Hudson v

McMillan, 503 US 1 [1993])."[2]

140.    In addition to the excessive force used against Ms. McCully, the culture and

environment of brutality endemic within the El Paso County Sheriff's Office, and the lack of an

adequate use of force policy, training, supervision and discipline of law enforcement officers is

evidenced by a significant history and custom of brutality, including the following incidents.

141.    On September 26, 2007, Brock John Behler, then an inmate in the Jail, was

excessively forcefully placed in a bear-hug type hold by Deputy Dennis Grivois.  Deputy Grivois

claimed Mr. Behler fought back while he was being restrained, so Deputy Grivois threw Mr.

Behler to the floor, breaking Mr. Behler's arm.  El Paso County settled the civil rights case for

$80,000 in 2010.[3]

---

[2] Organizational Assessment at p.46-47
[3] Rick Montanez, "County to Pay Out $80k to Ex-Inmate Over Lawsuit, KTTVO 11 News, June 15, 2010 (see:
<u>http://www.kktv.com/home/headlines/96440444.html</u>)

142.    Although then-Sheriff Maketa tried to absolve himself of responsibility for Deputy Grivois' use of excessive force, stating "We can't defend what that deputy did,"[4] Sheriff Maketa's lack of a constitutionally adequate Use of Force Policy and lack of training respecting use of force were directly responsible for Mr. Behler's injuries.

143.    In fact, during his tenure, then-Sheriff Maketa allegedly had his hands full carrying on simultaneous liaisons with numerous female subordinates, and allegedly was busy doling out preferential treatment to those with whom he had intimate sexual relations and discriminating against subordinates who refused to engage in such intimate sexual relations with him.[5]

144.    According to an official Organizational Assessment paid for by public funds, these alleged actions and inactions on the part of then-Sheriff Maketa resulted in "an absence of leadership and supervisory training and accountability"[6] and led to a "total breakdown in morality and professionalism"[7] within the El Paso County Sheriff's Office.

145.    The dramatic increase in use of force incidents in the Jail between 2010 and 2014 described above directly coincides with then-Sheriff Maketa's increasing distraction by his alleged affairs and related extracurricular activities which caused the breakdown in supervision and training.

146.    During these years, then-Sheriff Maketa was "asleep at the wheel," or worse, and inmates like Ms. McCully and others described below paid the price.

---

[4] Id.
[5] Kirk Mitchell, "Federal Judge Says Some Claims Against Former El Paso Sheriff Will Go Forward," The Denver Post, April 1, 2016 (see: http://www.denverpost.com/news/ci_29713194/federal-judge-says-some-claims-against-former-el)
[6] Organizational Assessment at p.7.
[7] Organizational Assessment at p.8.

147.   On October 6, 2009, an El Paso County Sheriff's Office SWAT team stormed into the home of Rose Santistevan, 69, as part of a drug bust in which her son, Kirt, was targeted. However, Kirt Santistevan was then in custody at the Teller County Jail on a DUI charge, a fact allegedly known to the SWAT team deputies.  Nevertheless, although Ms. Santistevan's house contained numerous signs warning she used oxygen, deputies forced their way in, battering in her door with a ram, shattering glass all over her living room, and charging in while displaying automatic weapons.  A flash bang was also detonated.  Deputies seized Ms. Santistevan at gunpoint as her home filled with smoke and she tried to breathe with an oxygen hose.  Ms. Santistevan was rushed to the hospital for respiratory and heart problems and spent a week recuperating there.  El Paso County settled this lawsuit for $75,000 in 2013.[8]

148.   On September 13, 2011, Deputy Marcus Miller shot and killed Christine Vargas as she tried to drive away from him and two other deputies, and in the process drove over Deputy Miller's foot.  El Paso County settled this civil rights lawsuit in 2015 for $300,000. Nevertheless, the El Paso County Sheriff's Office and the Fourth Judicial District Attorney's Office condoned and ratified Deputy Miller's outrageous and unforgiveable use of lethal excessive force.  Deputy Miller was cleared of criminal wrongdoing, and his only punishment was a 20-hour suspension without pay for drawing a weapon when such force was not warranted. As of August 2015, Deputy Miller remained employed on the force.  The two other deputies involved in the fatal incident, Deputy Glenn Boardman and Deputy Christopher Gonzalez, received only letters of reprimand for policy violations, such as failing to notify dispatch that they had stopped a vehicle.  They were later promoted to detective and sergeant, respectively.  At

---

[8] Pam Zubeck, "El Paso County Deputies Hear Excessive-Force Accusations," The Colorado Springs Independent, August 5, 2015 (see: http://www.csindy.com/coloradosprings/el-paso-county-deputies-hear-excessive-force-accusations/Content?oid=3255850).

the time, the El Paso County Sheriff's Office lacked a policy on the use of lethal force, any

recognition of the sanctity of life or of the significance of using deadly force, and any policy with

regard to shooting at or from moving vehicles and tactically approaching vehicles.[9]  Christine

Vargas paid with her life for these omissions and others, an attendant lack of training, and

ratification of the casual use of lethal force.[10]

149.    On June 11, 2013, correctional officer Deputy Patrick Smith attacked inmate

Robert Montoya without any provocation, striking Mr. Montoya in the face, pushing him into a

wall, beating him and sitting on him.  Not only was Mr. Montoya seriously injured, but just as in

Ms. McCully's case, correctional officers acted with deliberate indifference to the serious

medical injuries they themselves had caused.  Mr. Montoya was refused medical treatment for

his injuries that resulted in further injuries and aggravation of injuries, including a concussion,

memory and cognitive problems, increased anxiety and post-traumatic stress disorder.  El Paso

County settled this civil rights lawsuit for $24,999 in 2015.  As in the case of Christine Vargas,

the El Paso County Sheriff's Office condoned and ratified Deputy Smith's use of excessive force

and deliberate indifference to an inmate's serious medical needs by retaining him on the force,

where he remained employed as a deputy as of August 2015.[11]

150.    In the context of the incidents detailed above and many others, the lack of a

constitutionally acceptable use of force policy, the absence of accountability and training and a

general breakdown of any kind of order, trust or ethics on then-Sheriff Maketa's watch, the

excessive force used against Ms. McCully is not at all surprising, and clearly reflects the very

---

[9] Organizational Assessment at p. 46.
[10] Zubeck, "El Paso County Deputies Hear Excessive-Force Accusations," supra, fn 10.
[11] Id.

*modus operandi* or standard operating procedure of the El Paso County Sheriff's Office at the time.

151.     El Paso County's custom, pattern and practice of excessive force and deliberate indifference to a detainee's known serious medical condition caused Plaintiff McCully severe physical and emotional damage.

**D.  EL PASO COUNTY'S  AND CCS DEFENDANTS' RESPECTIVE CUSTOM, PATTERN AND PRACTICE OF DELIBERATE INDIFFERENCE TO INMATES' SERIOUS MEDICAL NEEDS**

152.     The CCS Defendants, El Paso County and the El Paso County Sheriff's Office maintained constitutionally deficient policies and neglected to train their respective employees with respect to the proper procedures for the evaluation and treatment of inmates' serious medical needs.

153.     Upon information and belief, the CCS Defendants and Defendant El Paso County had a contractual agreement by which the CCS Defendants would provide medical services at the Jail.

154.     Upon information and belief, the contract entered into between the CCS Defendants and Defendant El Paso County made the CCS Defendants responsible for providing medical, dental, psychiatric, technical, and pharmaceutical care and support personnel necessary for the rendering of health care services to inmates at the Jail.

155.     El Paso County Sheriff's Office deputies and CCS Defendant medical staff engaged in a persistent custom and practice of law enforcement misconduct with respect to the treatment of detainees with serious medical and/or mental health needs, and the officials responsible for assuring that such misconduct does not occur consistently failed to properly train,

supervise, and discipline individual officers and medical staff who have engaged in such misconduct.

156.     Specifically, the El Paso County Sheriff's Office Use of Force policy in effect at the time omitted any mention of a duty on the part of officers or medical staff to provide medical assistance to persons against whom force was used.[12]

157.     Not only did the El Paso County Sheriff's Office consistently fail to provide constitutionally adequate medical care to inmates, with respect to inmates with mental illness, the Organizational Assessment notes:

> "[The Organizational Assessment's authors] [were] told that '80% of the population have mental health problems and over 1/3 of the [inmate] population are on medications for a mental illness.'… The 2014 data would suggest that approximately 12.3% of the 2014 inmate population suffered a recognized mental health condition."… [Yet] [m]ental health support is on-site from 0700 hrs. to 2100 hrs. each day.  Staff is without these mental health service personnel for the remaining 10 hours of the day.  For 42% of any day, staff is expected to address the mental health behavioral and needs of the population during the absence of the mental health staff."[13]

158.     El Paso County law enforcement officers have repeatedly and unlawfully shown deliberate indifference to and ignored the serious medical and/ or mental health conditions of its inmates, which has resulted in numerous serious and preventable injuries to Jail inmates, some of which are detailed below.

159.     On January 7, 2013, Christopher Spencer nearly died after being shot in the chest during an attempted robbery in Colorado Springs.  Mr. Spencer was transferred from a hospital to the Jail on February 15, 2013.  Because of the gunshot wounds, Mr. Spencer's circulation was compromised and his feet began to swell, his feet and toes turning multicolored.  Despite his debilitating pain, Mr. Spencer was not provided with a wheelchair, and ultimately he was

---

[12] Organizational Assessment at p.47.
[13] Id. at p. 18-19.

transferred to a cellblock where his brother cared for his feet for a period of three weeks. The gangrene left Mr. Spencer's feet and toes visibly festering with sores and, eventually, rock hard and rotten, and rendered him unable to walk without debilitating pain. Through petitions, Mr. Spencer and other inmates begged deputies to get him the medical help he needed, but there pleas fell on deaf ears. It was not until Mr. Spencer's family bailed him out of the Jail on April 16, 2013, that he received proper medical care, but by then his toes and part of his left foot had to be amputated. A lawsuit with respect to Jail staff's deliberate indifference to Mr. Spencer's obvious and serious medical condition is pending against El Paso County and the individual officers involved.[14]

160.    As detailed above in ¶ 149 above, in June 2013, El Paso County Jail staff turned a blind eye to Mr. Montoya's serious medical injuries – injuries caused by Deputy Patrick Smith in a vicious and totally unprovoked attack. Due to the denial of constitutionally adequate medical care, Mr. Montoya suffered deteriorating and severe injuries. As detailed above, the El Paso County Sheriff's Office condoned and ratified Deputy Smith's actions and inactions by retaining Deputy Smith on the force as of August 2015.

161.    At the time of the events alleged herein, Defendant CCS was a national company with a disgraceful history of failing to provide constitutionally adequate medical care to inmates.

162.    There is an abundance of examples in Colorado, and nationwide, establishing that the CCS Defendants and the counties that employ them are deliberately indifferent in their policies, customs, and practices with respect to the medical needs, and constitutional rights, of inmates.

---

[14] Kirk Mitchell, "Man Sues El Paso County Jail After Losing All Toes, Foot to Gangrene," The Denver Post, February 24, 2016 (see: http://www.denverpost.com/news/ci_27591383/man-sues-el-paso-county-jail-after-losing)

163.     In *McGill v. Correctional Healthcare Companies, Inc. et al.*, Case No. 1:13-cv-01080-RBJ-BNB (D. Colo.), Kenneth McGill sued Defendant CCS for deliberately indifferent failure to provide appropriate medical care in response to a stroke he suffered at the Jefferson County Detention Facility.  Similar to Ms. McCully's case, Defendant CCS employees, acting with deliberate indifference, failed to take Mr. McGill to a hospital in a timely fashion where he could have received necessary emergency medical care.  This case went to trial and resulted in a plaintiff's verdict for approximately $11 million, including the imposition of over $8 million in punitive damages.

164.     In *Revilla v. Stanley Glanz, Sheriff of Tulsa County, et al.*, Case No. 4:13-cv-00315-JED-TLW (N.D. Okla.), several plaintiffs sued Defendant CCS in connection with three deaths and one near fatality that occurred at the Tulsa County Jail.  One plaintiff died due to bowel perforation and sepsis after medical staff refused to transport him to the hospital despite escalating and serious symptoms.  Another detainee died from a heart attack after complaints of chest pain were ignored for days without emergency transport.  A third detainee, who had a known history of cardiovascular problems, died after complaints of pain, nausea, and vomiting were ignored and emergency transportation was denied.  It was alleged that "[t]here is a longstanding policy, practice or custom at the Jail of CCS/CHM/CHMO and TCSO [the jail] of refusing to send inmates with emergent needs to the hospital . . . ." The United States District Court for the Northern District of Oklahoma denied the defendants' motion to dismiss and this case is in active litigation.

165.     In *Lara-Williams/Burke v. Glanz, et al,* 11-CV-720-JED-PJC (N.D. Okla.), an inmate named Earl Williams died after he was known to have gone days without food or water.  Mr. Williams' serious and known medical needs were ignored by CHC medical staff because

40

there was an inappropriate 'faking or malingering' diagnosis that prevented him from receiving timely hospital care.  Expressly concluding that he was faking paralysis, the nurses recklessly ignored Mr. Williams deteriorating and dehydrated status. CHC staff moved him into a medical 'observation room' to videotape him *to prove* that his paralysis was fake – which it turned out not to have been. Before he died, staff threw food at Mr. Williams and put water just outside his reach.   It was alleged in that case that the CHC-related defendants "maintained a policy, practice, and/or custom of severely limited the use of off-site medical, mental health and diagnostic service providers, even in emergent situations, in disregard to the known, obvious and excessive risks to the health and safety of inmates."

166.     In *Layton v. Board of County Commissioners of Oklahoma County, et al*., Case No. 5:09-cv-01208-C (W.D. Okla.), Charles Holdstock died after the medical staff of a CCS-related company ignored lab results that Mr. Holdstock's kidneys were not functioning properly (and were failing to eliminate the toxic build-up of his heart medication).  Mr. Holdstock was found unresponsive on his cell floor and later died in a hospital emergency room.

167.     In *Turley v. Correctional Healthcare Management, Inc., et al.*, Case No. 1:10-cv-02772-REB-BNB (D. Colo.), Robert Turley experienced severe pain in his throat when a piece of a sandwich became lodged in his esophagus.  He began coughing up blood and alerted the guards and medical personnel.  The nurse who evaluated him simply gave him Tylenol and advised him that he would have to wait to see the physician.  Mr. Turley became hypoxic and unconscious, and had to be taken by ambulance to the hospital where he underwent emergency surgery for an esophageal perforation. Although Mr. Turley survived, he had significant medical issues that resulted from CCS's mistreatment.

168.     In *Estate of Bruce R. Howard, et al. v. County of El Paso, Colorado et al.*, Case No. 1:10-cv-02740-CMA-MEH (D. Colo.), Bruce Howard died of a cardiac arrhythmia after CCS staff denied him his heart medication after his arrest.  During his brief incarceration, Mr. Howard made repeated pleas to CCS medical staff for his heart medication that were ignored.  He received no treatment despite his visible shakiness and assertions that he was hallucinating.

169.     In *Moritz v. Correctional Healthcare Companies, Inc., et al.*, Case No. 4:14-cv-00656-GFK-PJC (N.D. Okla.), Michael Moritz died in the Tulsa County Jail.  CCS employees denied his repeated requests to administer his medications.  Mr. Moritz's situation became critical, and he was finally transported by ambulance to the emergency room where he remained on life support until his death.

170.     In *Guerrero v. Wichita County, Texas et al.*, Case No. 7:14-cv-0058-O (N.D. Tex.), CCS employees ignored Nicole Guerrero's obvious signs of labor and left her unattended in a solitary cell.  CCS staff then failed to transport her to the hospital for safe delivery.  The baby was purplish and in need of medical attention upon delivery, yet CCS staff did not take steps to resuscitate the newborn or administer CPR.  The baby was pronounced dead shortly after birth.

171.     A common thread in these, and many other, cases is that CCS and related companies ignored obvious signs and symptoms to deny inmates access to necessary, emergent medical care. Such deficiencies are the custom, practice, and standard operating procedure of Defendant CCS and its related entities.

172.     Various governmental institutions have repeatedly made extensive reports of constitutional deficiencies in the care provided by CCS-related entities.

173.    In 2007, the National Commission on Correctional Health Care ("NCCCS") auditors reported serious and systemic deficiencies in the care provided to prisoners by CCS-related companies in the Tulsa jail, including failure to triage sick calls and failure to address health needs in a timely manner.

174.    In 2008, the Department of Justice found that the jail medical program, administered by a CCS-related entity, was constitutionally deficient in a number of regards. Specifically, the DOJ found problems in "providing appropriate access to medical care during emergencies" citing a case where a woman went into premature labor and delivered a baby while handcuffed to a chair rail. This happened after her complaints, including that her water had broken, were ignored.  The DOJ found that there were "critical lapses in getting emergency medical care to detainees."  The DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to remedy the violations found, "we generally did not observe improved conditions at the time of the second tour."

175.    In 2009, an Oklahoma Department of Health investigation indicated that such deficiencies by CCS-related companies continued unabated despite the abundant notice of the same from NCCCS and DOJ.

176.    In 2010, during a NCCCS audit, high-level employees of CCS attempted to fraudulently change medical records to give the appearance of compliance.  NCCCS found deficient care, deficient investigation into deaths, and a lack of timely diagnostic and specialty services.  Even after this audit, CCS did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health.  High-level CCS employees repeatedly brought to CCS's attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening

conditions, but the corporation refused to make any changes to the way CCS-related companies operated.

177.     In November 2011, the Tulsa County Jail's own retained auditor found deficiencies in CCS's care.

178.     In 2011, U.S. Immigration and Customs Enforcement and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") also conducted a review of the medical care provided by CCS and related companies, reporting: "CRCL found a prevailing attitude among clinic staff of indifference….", "Nurses are undertrained.  Not documenting or evaluating patients properly."

179.     Defendant El Paso County, in contracting with CCS-related companies to provide medical care at the Jail, knew or should have known of these serious issues in patient care, licensure, and accreditation of CCS-related prison programs, the findings of multiple governmental agencies, and refusals by CCS to correct deliberately indifferent policies. Therefore, Defendant El Paso County is liable for the selection and retention of CCS to provide medical services.

180.     Defendant El Paso County has a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees.

181.     CCS Defendants and Defendant El Paso County had all of the above-described knowledge and notice prior to Ms. McCully's deliberately indifferent treatment and injuries, which were the result of longstanding, systemic deficiencies in the medical care provided to inmates by CCS, as well as the widespread company policy of refusing to send inmates with emergency medical needs to the hospital or other off-site providers.

182.     Viewed in light of the incidents above, Defendants' deliberate indifference to Plaintiff's obvious and serious medical needs, as evidenced by her near inability to stand up or walk, the deep purple bruising visible all over her legs, knees and arms, and her repeated pleas for help and continued insistence that her left knee was broken and she needed to be taken to a hospital, can only be seen as customary.  Defendants' simultaneous awareness of and disregard for Plaintiff's serious medical needs was the rule, not the exception, and merely reflected the custom, practice and pattern of each of the El Paso County Sheriff's Office and the CCS Defendants.  On the part of Defendant El Paso County, this cruel standard operating procedure stemmed from the lack of any written policy with respect to the provision of medical assistance to inmates against whom excessive force is used, a general lack of leadership, accountability and training emanating from the very top of then-Sheriff Maketa's Office, and the routine ratification of officers' deliberate indifference to inmates' serious medical needs.  On the part of the CCS Defendants, this same cruel standard operating procedure stemmed from a lack of training, policies discouraging transportation to off-site medical facilities even in cases of inmates' serious medical emergencies, and a long culture and history of deliberate indifference to inmates' known serious medical needs.

183.     As a result of Defendants' blatantly illegal actions, Ms. McCully has suffered grave and lasting physical and emotional damage.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**42 U.S.C. § 1983**
**Fourteenth Amendment Violation – Excessive Force**
**(Against Defendants Grady, Farrell, Hanenberg, Rogers, Rincon and El Paso County)**

45

184.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

185.    Defendants Grady, Farrell, Hanenberg and Rogers, Rincon and El Paso County were acting under color of state law in their actions and inactions that occurred at all times relevant to this action.

186.    At the time when Plaintiff was knocked down and restrained by Defendants Grady, Farrell, Hanenberg and Rogers, and later by Defendants Rincon and once again Grady, with excessive force, Ms. McCully had a clearly established constitutional right to be secure in her person from excessive force.

187.    Defendants herein knew, and any reasonable law enforcement officer knew or should have known of this clearly established right.

188.    Defendants Grady, Farrell, Hanenberg, Rogers and Rincon engaged in use of force that was objectively unreasonable in light of the facts and circumstances confronting them, violating Ms. McCully's Fourteenth Amendment rights.

189.    Defendants Grady's, Farrell's, Hanenberg's, Rogers' and Rincon's respective actions and inactions, as described above, were motivated by intent to harm Plaintiff.

190.    Defendants Grady's, Farrell's, Hanenberg's, Rogers' and Rincon's respective actions and inactions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

191.    The acts and omissions of each Defendant described herein, were the legal and proximate cause of Ms. McCully's damages.

192.    The acts and omissions of Defendants Grady, Farrell, Hanenberg, Rogers and Rincon were engaged in pursuant to the custom, policy, and practice of the Defendant El Paso

County, which encouraged, condoned, tolerated, and ratified the use of excessive force by law enforcement officers, lacked a written use of force policy and failed to adequately train its employees with respect to the use of excessive force.

193.     The acts or omissions of Defendant El Paso County caused Ms. McCully to suffer severe physical and emotional damages.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment – Failure to Provide Medical Care and Treatment
### (Against All Defendants)

194.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

195.     At all times relevant to the allegations in this Complaint, Defendants were acting under color of state law.

196.     Ms. McCully had a clearly established right under the Fourteenth Amendment to be free from deliberate indifference to her known serious medical needs.

197.     Each individual Defendant knew or should have known of this clearly established right at the time of Ms. McCully's detainment.

198.     At all times relevant to the allegations in this Complaint, each individual Defendant knew of and disregarded the excessive risks associated with Ms. McCully's serious and obvious medical condition, and risks associated with their failure to provide or procure medical treatment for her medical needs.

199.     Nevertheless, with deliberate indifference to Ms. McCully's constitutional right to adequate medical care, as provided by the Due Process Clause of the Fourteenth Amendment, Defendants knowingly failed to examine, treat, and/or care for Ms. McCully's worsening condition.  They did so despite their knowledge of Ms. McCully's serious medical needs, thereby

placing her at risk of serious physical harm and continuing unabated pain.  Therefore, Defendants knew or were aware that Ms. McCully faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

200.    When Ms. McCully alerted each Defendant to her need for medical assistance, Defendants acted with deliberate indifference to Ms. McCully's readily apparent need for medical attention and her constitutional rights by providing constitutionally inadequate medical attention and treatment for her.

201.    All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

202.    The acts or omissions of each individual Defendant were the legal and proximate cause of Ms. McCully's injuries and ongoing, excruciating pain.

203.    The acts and omissions of each individual Defendant caused Ms. McCully damages in that she suffered extreme physical and mental pain while she was in Defendants' custody for approximately 5 days.

204.    The intentional actions or inactions of each individual Defendant as described herein intentionally deprived Ms. McCully of due process and of rights, privileges, liberties, and immunities secured by the Constitution, and caused her other damages.

205.    The acts and omissions of the Jail Staff Defendants were engaged in pursuant to the custom, policy, and practice of the Defendant El Paso County, which at the time lacked a written policy with respect to the provision of medical assistance to inmates against whom excessive force was used, generally operated under a serious absence of leadership, accountability and training coming from the very top, and routinely condoned, tolerated, and ratified officers' deliberate indifference to the serious medical needs of inmates.

206.    The acts and omissions of the Medical Staff Defendants were engaged in pursuant to the custom, policy and practice of the CCS Defendants.

207.    Defendant El Paso County's and the CCS Defendants' respective unconstitutional policies, customs, or practices, as described herein, were the legal and proximate cause of Ms. McCully's deprivation of appropriate medical care at the Jail.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law and equity, including, but not limited to the following:

a.   Declaratory relief and injunctive relief, as appropriate;

b.   Actual economic damages as established at trial;

c.   Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.   Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.   Issuance of an Order mandating appropriate equitable relief, including but not limited to:

i.   Issuance of a formal written apology from each Defendant to Plaintiff;

ii.   The imposition of policy changes designed to avoid future similar misconduct by the Individual Defendants;

iii.  Imposition of disciplinary action against appropriate employees of Defendant El Paso County; and

iv. Imposition of disciplinary action against appropriate employees of the

CCS Defendants;

f.   Pre-judgment and post-judgment interest at the highest lawful rate;

g.   Attorneys' fees and costs; and

h.   Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 28th day of April 2016.

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*
_____
Darold W. Killmer
Eudoxie (Dunia) Dickey
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dkillmer@kln-law.om
ddickey@kln-law.com

ATTORNEYS FOR PLAINTIFF